**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ALLIANCE FOR GLOBAL JUSTICE, et al.,

Plaintiffs,

v.

DISTRICT OF COLUMBIA, et al.,

Defendants.

Civ. Action No. 01-811 (PLF/JMF)

# REPORT AND RECOMMENDATION

Before me are Defendant District of Columbia's Motion for Partial Summary Judgment [288] ("Dist. Mot."), and Defendants Chief Charles H. Ramsey's and Terrance W. Gainer's Renewed Motion for Summary Judgment [289] ("Ramsey Mot.") (together, "Defs. Motions"), and Motion for Summary Judgment Filed by the Plaintiff Class and by Elizabeth Butler Against the District of Columbia Municipality [290] ("Pls. Motion").

Also before me are Motion Of Defendant District Of Columbia to Exclude Certain of Plaintiffs' Exhibits [295], Motion of Defendants Charles H. Ramsey and Terrance W. Gainer to Exclude Certain of Plaintiffs' Exhibits [308], Motion to Exclude and Evidentiary Objections to the Declarations and Testimony of Jeffrey Herold, Charles Ramsey, and Terrance Gainer, and Other Exhibits Filed in Support of Defendants' Motions for Summary Judgment and in Opposition to Plaintiffs' Motion for Partial Summary Judgment [309], Plaintiffs' Motion to Exclude Inadmissible Representations Made in Jeffrey Herold's Declaration Dated October 24, 2007 and Filed on the Evening of October 26, 2007 [310], and Motion of Defendant District of Columbia to Exclude Certain of Plaintiffs' Exhibits [312] (together, the "Motions to Strike").

## I. Introduction

This case arises from incidents occurring in Washington, D.C. during the mass demonstrations (the "Protests") held in conjunction with meetings of the International Monetary Fund and the World Bank on April 14-17, 2000. The first incident involved police action at a property referred to as the "Convergence Center" (hereinafter, the "Center"), located at 1328 Florida Avenue, Northwest. The second incident involved the arrest of 673 people in the vicinity of 20th and K Streets, Northwest. Other incidents involve the alleged use of excess force by police officers.

The Center was used for lodging by out-of-state demonstrators during the Protests, and was also used as a meeting place. On April 15, 2000, an official with the District of Columbia Fire and Emergency Medical Services ("Fire Department") visited the Center and concluded that there were violations of the Fire Code. That official ultimately ordered the Center to be closed and its occupants to leave; the Metropolitan Police Department ("MPD") assisted in the closing of the Center and the removal of its occupants. Plaintiff Elizabeth Butler was arrested during that time. The parties dispute whether the Fire Department was used by MPD to conduct a search without first obtaining a warrant, whether the eviction of the occupants and the alleged seizure of their personal property was improper, and whether probable cause existed to arrest Ms. Butler.

In regard to the mass arrests, demonstrators assembled in front of the Department of Justice on Pennsylvania Avenue, Northwest, on April 15, 2000, and proceeded to an area near the International Monetary Fund on 19th Street, Northwest, where MPD ultimately arrested 673 people. The parties dispute the legality of these arrests and the propriety of actions taken afterward by law enforcement officials.

Finally, plaintiff Robert Fish claims that he was beaten by law enforcement while attempting to photograph police misconduct at the Protests. Brian Edwards-Tiekart and Sasha Wright claim to have been struck in the face with batons wielded by MPD officers who, they allege, had removed their badges and name tags to conceal their identity. Adam Eidinger claims to have been injured by pepper spray fired without justification by MPD officers. Defendants dispute these allegations and assert that, even if true, they can not be subject to liability.

At the time of the events in question, Charles H. Ramsey was Chief of Police and Terrance W. Gainer was his Executive Assistant.

## II.     Summary Judgment

Summary judgment shall be granted upon a showing that there is no genuine issue of material fact and that the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(c). A court must view the facts in the light most favorable to the non-movant, thus giving the non-movant the benefit of all reasonable inferences derived from the evidence in the record. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If there is admissible evidence that, if credited, would permit a reasonable juror to return a verdict in favor of the opponent of the motion, the motion must be denied. Id. at 249. It is inappropriate for the court to resolve issues of credibility in resolving a motion for summary judgment. Athridge v. Rivas, 312 F.3d 474, 478 (D.C. Cir. 2002).

## III.    The Plaintiffs' Motions

Plaintiffs move for summary judgment on their claims relating to the mass arrests and to the arrest of Elizabeth Butler.

**A. The Mass Arrests**

Plaintiffs provide various arguments in support of their motion as it relates to the mass arrests, but the Court need look no further than a case decided less than two years ago by our Court of Appeals. Barham v. Ramsey, 434 F.3d 565 (D.C. Cir. 2006). That case arose from the mass arrest in Washington, D.C. of anti-globalization demonstrators on September 27, 2002. MPD Assistant Chief Peter Newsham purported to have witnessed widespread infractions by demonstrators that morning and, in particular, during the hour in which he observed Pershing Park. Based on those observations, Newsham issued an order for the arrest of everyone in Pershing Park – a decision that Ramsey, who arrived on the scene prior to the arrests being made, did not question.

The arrests – 386 in total – were made "with no prior warning to the occupants of the park to disperse and no warning to them that arrest was imminent." Id. at 149. The Court of Appeals, affirming summary judgment in favor of a class of arrestees, held the mass arrests to be "clearly" in conflict with established constitutional rights:

> Undisputed evidence reveals that Newsham arrested an undifferentiated mass of people on the basis of crimes committed by a handful of individuals who were never identified. Because nothing in the record suggests that Newsham had particularized probable cause to arrest each of the 386 persons caught in the police sweep.

Id. (citing Ybarra v. Illinois, 444 U.S. 95 (1979)). It is clear that, even if the Court were to accept as true the facts as presented by defendants, the arrests made in the present case suffer from the same fatal flaw as those made in Barham – namely, that there was no "particularized probable cause to arrest each of the [673] persons caught in the police sweep." Id.

It is fanciful to argue, as defendants do, that each of the 673 "persons within the cordon was [amongst] the group that Herold had been immediately behind and had been ordering to leave the street and proceed on the sidewalks." Statement Pursuant to LCvR 7(h) of Material Facts Giving Rise to Genuine Issues Requiring Litigation by Trial in Accordance with Defendant District of Columbia's Demand for a Trial By Jury ("Dist. Opp. Stmt. of Facts") at ¶ 11 (asserting that Herold had observed "no persons on the sidewalks within the intended police lines" prior to the arrests), attached to Defendant District of Columbia's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Defs. Opp."); see also Barham, 434 F.3d at 573 ("[A]ppellants cannot conceivably impute to Newsham probable cause to believe each person in Pershing Park at the moment of arrest had violated this ordinance . . . This conclusion requires no elaboration.").

Indeed, defendants describe the arrestees as having "engaged in [illicit] conduct for hours in a 'snake march' from 10th Street NW and Pennsylvania Avenue to the intersection of 20th and I Streets, NW, while persistently refusing to comply with directives by MPD Lieutenant Jeffrey Herold directing them to move out and stay out of the roadways." Dist. Opp. Stmt. of Facts at ¶ 2; see also id. at ¶ 4 ("The group that Herold was monitoring and warning traversed from 16th Street N.W. to 20th Street, N.W. in the roadway and constantly refused to leave the roadway."); id. at ¶ 9 (describing the march as "fluid, and 'fragmented'"). To quote Judge Emmet G. Sullivan in Barham v. Ramsey, 338 F. Supp. 2d 48, 57-58 (D.D.C. 2004), it is "nothing short of ludicrous" to suggest that particularized probable cause existed to believe that *each* of the 673 people cordoned off were amongst those demonstrators observed by Herold to have committed

wrongs during the "fluid" and "fragmented" "snake march" taking place over the course of hours through ten blocks and ending in a major urban thoroughfare during rush hour. Like Newsham in Barham, "even assuming that [Herold] had probable cause to believe that *some people* present that morning had committed arrrestable offenses, he nonetheless lacked probable cause for detaining *everyone* who happened to be in the park." Barham, 434 F.3d at 573 (emphasis in original). See also id. at 574 ("Nowhere have appellants suggested that the particular individuals observed committing violations were the same people arrested; instead, they refer generically to what 'demonstrators' were seen doing.").

Defendants argue that Herold gave repeated warnings to the arrestees and an opportunity for them to comply with his orders. Dist. Opp. Stmt. of Facts at ¶¶ 9, 12-13. It is true that police officers may conduct a mass arrest "after invoking a legal mechanism for clearing the area and then providing an opportunity for affected persons to follow an order to disperse." Barham, 434 F.3d at 576. But in a situation such as the one here, with roaming demonstrations through city blocks populated with residents and business people, the "fluid[ity]" and the "significant time lag between" the demonstrators' disruption and their arrests made it impossible for Herold to reasonably suspect "that all of the occupants of [the area of the arrests] were then breaking the law[,] that they had broken the law before entering" that area, id. at 156, or that his "notice [was] reasonably likely to have reached all of the crowd despite any noise the demonstrators may have been making." Dellums v. Powell, 566 F.2d 167, 181-82 n.31 (D.C. Cir. 1977). There were simply too many moving pieces. See Braham, 434 F.3d at 574 ("Ultimately, this

case is not about a group of lawbreakers entering an uninhabited park and then remaining united inside.”).

It is clear, then, that following conclusion made in Barham can be adapted to the present case:

> While we have no reason to doubt that unlawful activity might have occurred in the course of the protest – with some individuals engaging in disorderly conduct, for example – the simple, dispositive fact here is that [defendants] have proffered no facts capable of supporting the proposition that [Herold] had reasonable, particularized grounds to believe every one of the [673] people arrested was observed committing a crime.

Id. at 574.

**B. The Arrest of Elizabeth Butler**

Plaintiff Elizabeth Butler moves for summary judgment on her common law claim of false arrest. Pls. Motion at 36. Butler was arrested at the Center during the time its occupants were being removed by MPD. Id. at 37. She testified at her deposition that, although she expressed her opinion that the occupants were improperly being removed, she was nevertheless cooperating with the effort. Deposition of Elizabeth Butler (“Butler Dep.”) at 55-56, attached to Pls. Motion as Exh. 17. She testified that she was arrested by an unnamed police officer after disagreeing, but ultimately complying with, an order that the occupants leave all of their personal property in the Convergence Center. Id. She claims that there was no probable cause for her arrest.

Defendants insist that probable cause existed to arrest “Ms. Burke [sic] [for failing to obey] repeated orders to actually leave the premises.” Defs. Opp. at 20-21. In support of this contention, the only evidence proffered by defendants is Butler’s deposition – and, more specifically, lines 71:14 to 72:13 thereof. Dist. Stmt. of Facts at ¶

67. In that portion of deposition testimony, however, Butler explains that she was asking people to leave and was herself walking towards the exit. Although at one point she walked backwards, she "was always moving in the general location of leaving it [the Center] for five minutes beforehand." Butler Dep. at 72. She claims that she was one of the last to leave and was walking with the police as she left. Id.

At no point does Butler admit that she refused the order to leave; to the contrary, she testified that, despite her disagreement, she complied with the order and instructed others to do so as well. There is therefore no support in the only exhibit cited by the District for its assertion that she continually refused to obey the orders to leave the Center. In the absence of any conflicting evidence from the arresting officer or any other witnesses, it is my recommendation that she be entitled to summary judgment on her claim of false arrest.

**IV. The Defendants' Motions**

Defendants' motions for summary judgment are of heightened importance in light of the recommendation above that plaintiffs be granted summary judgment on claims involving the mass arrests and the arrest of Butler. These motions set forth what can essentially be described as threshold defenses against liability.

The District argues in its motion that plaintiffs cannot establish municipal liability under 42 U.S.C. § 1983[1] because none of the actions alleged to have been committed by its employees were done pursuant to a "policy or custom" of the District, nor were those actions ratified. Defendant District of Columbia's Memorandum of Points and Authorities in Support of Its Motion for Partial Summary Judgment ("Dist. Memo") at 13-15. In regard to the Center, the District argues that plaintiffs did not have a

[1] All references to the United States Code are to the electronic versions that appear in Westlaw or Lexis.

constitutionally protected interest in the premises and that the inspection and closure was a valid application of a neutral law.[2]

Ramsey and Gainer, in their motion, argue that qualified immunity bars plaintiffs' suit against them. In particular, they insist that: (a) they were not present until after the mass arrests were made; (b) the arrests were based on probable cause for parading without a permit and failing to obey a police order; and (c) there was no violation of the First Amendment because no decisions made by them were based on the content of the demonstrators' expression. Defendants Chief Charles H. Ramsey and Terrance W. Gainer's Memorandum of Points and Authorities in Support of Their *Renewed* Motion for Summary Judgment ("Ram. Memo").

**A. Municipal Liability and Qualified Immunity**

The District seeks summary judgment on the basis that it cannot be subject to municipal liability for the harms alleged by plaintiffs, and Ramsey and Gainer argue that they are entitled to summary judgment on the basis of qualified immunity.

In regard to municipal liability, a municipality is a "person" who can be held liable for the violation of constitutional rights under 42 U.S.C. § 1983 if the plaintiffs establish that their injuries were inflicted by a policy or custom of the municipality. Daskalea v. Dist. of Columbia, 227 F.3d 433, 441 (D.C. Cir. 2000) (quoting Monell v. Dep't of Social Services, 436 U.S. 658, 694 (1978)). It may be sufficient that the municipality was either deliberately indifferent to the violation of plaintiffs' constitutional rights, or that it failed to adequately train its employees. Id. at 442.

As for qualified immunity, Ramsey and Gainer are immune from suit unless they are proven to have violated a clearly established constitutional right. Anderson v.

[2] Note that the District also addresses other claims that have since been either conceded or abandoned.

Creighton, 483 U.S. 635, 640-41 (1987). Mere mistakes by police officials may not serve as a premise for liability; instead, the violations must be legally unreasonable, judged against the legal rules established at the time the action was taken. Wilson v. Layne, 526 U.S. 603, 614 (1999).

In short, resolution of defendants' motions depends on whether plaintiffs have proffered evidence upon which a reasonable juror could find: (a) for the District, that the alleged acts were the result of a policy or custom of the District, and (b) for Ramsey and Gainer, that they reasonably would have known they were violating plaintiffs' clearly established constitutional rights by undertaking the alleged acts. I will now address these questions in regard to the mass arrests, the closing of the Center, and the claims of excessive force brought by certain individual plaintiffs.

**1. The Closing of the Convergence Center**

Defendants claim that the Fire Department closed the Center with police assistance based on an inspection by Battalion Chief James Short in which he found violations of the Fire Code. Dist. Memo at 5-8. During that closure, plaintiffs claim that the police seized and have not returned various items of personal property from Robert Fish and Kimberley Grier, and a rented truck from an organization named "Seeds Of Peace." Plaintiffs' Opposition to Defendant District of Columbia's Motion for Partial Summary Judgment ("Pls. Opp. I") at 27-28. Defendants claim that they can not be held liable for the incidents surrounding the closure of the Convergence Center because (a) plaintiffs did not have a protected interest in that property, and (b) the closing constituted a valid application of neutral law.

**a. Protected Interest**

Defendants argue that the plaintiffs did not have a constitutionally protected interest in the Center because (1) they secured use of the property by false pretenses, and (2) no efforts were taken to express a privacy interest in the property.

First, defendants argue that the plaintiffs secured the property by falsely telling its owner that it would be used to create works of art, whereas it was actually used as a hostel for out-of-town demonstrators. Statement Pursuant to LCvR 7(h) of Material Facts As To Which Defendant District of Columbia Contends There Are No Genuine Facts ("Dist. Stmt. of Facts") at ¶¶ 5-8, attached to Dist. Motion. Defendants provide a letter from the Center's owner in which he states that he would not have permitted such a use if he had known in advance. Id. at ¶ 8 (citing letter from Paul Millstein of DDC to Deputy Fire Chief Adrian H. Thompson, dated April 17, 2000, attached to Dist. Motion at Ex. 3). It is the contention of the defendants that the occupants can not claim a constitutional interest in a property which they fraudulently seized. Dist. Memo at 18. Plaintiffs, in turn, deny that they misled the owner of the Center. Plaintiffs' Statement of Facts as to Which There Exists a Genuine Issue to Litigate ("Pls. Stmt. of Facts I") at ¶ 48.

Second, defendants insist that the occupants of the Center took no meaningful precautions to exclude others from the premises and "welcomed complete strangers into the building to come and go as they pleased." Dist. Memo at 18. As a result, defendants argue that the occupants could have had no reasonable expectation of privacy. Plaintiffs respond that the organizers restricted use of the Center to "those persons who were working with the Mobilization for Global Justice in support of their political and protest organizing efforts for the April, 2000 demonstrations." Pls. Stmt. of Facts I at ¶ 49. In

addition, the occupants had at various times asked media and law enforcement to leave. Id.

The evidence proffered by plaintiffs, if credited by a jury, would establish, by the standards set forth by defendants, the legitimacy of plaintiffs' presence at the Center. Dist. Memo at 17 (citing United States v. Elwood, 993 F.2d 1146, 1151 (5th Cir. 1993) (holding that Fourth Amendment privacy right attaches to property if the occupants were legitimately there, had the right to exclude others and did so, took normal precautions to preserve their privacy, and had a subjective expectation that the property would be free from government invasion)). Moreover, plaintiffs make the unopposed argument that Grier, Fish, and Seeds of Peace each had a possessory interest in the property alleged to have been seized by police at the Center, and, as a result, can make out a cognizable claim that their Fourth Amendment rights have been violated. Pls. Opp. I at 26 (citing United States v. Delgado, 903 F.2d 1495, 1502 (11th Cir. 1990)). See also Soldal v. Cook County, 506 U.S. 56, 61 (1992).

**b. The Closing as a Valid Application of a Neutral Law**

Defendants claims that the closing of the Center constituted a valid application of a neutral law – the Fire Code – and, as a result, there can be no liability. Dist. Memo at 19-21. Plaintiffs proffer evidence that tells a different story. Their evidence, if credited by a jury, supports their assertion that the closing of the Center was the result of coordination between the FBI, MPD, and the Fire Department, and was not motivated by concerns about the Fire Code. Pls. Opp. I at 36-39. According to plaintiffs, the FBI placed the Center under surveillance, and MPD placed in it an undercover agent. This combined surveillance did not uncover illegal activity, and an Assistant United States

Attorney determined that there was no probable cause to pursue a search warrant. In response, Christopher Combs, an FBI Agent, contacted a Fire Department official, James Talbert, to determine whether the "Fire Marshall could be used to gain entry into the [Center]." Id. at 36. Talbert promised to provide assistance and was instructed by Combs to "do the fire inspection and determine if illegal activity was going on there." Id. at 37 (quoting Deposition of Christopher A. Combs ("Combs Dep.") at 188:20-189:4, attached to Pls. Opp. I at Exh. 17). Plaintiffs assert that the details surrounding the closure, including the unusually large police force assisting the Fire Department, further supports their allegations. Id. at 39.

      This evidence, if credited, could establish a violation of the constitutional rights of the occupants of the Center, including Grier, Fish, and Seeds of Peace. An administrative fire inspection is of course permissible – but plaintiffs' evidence, if credited, would establish that the fire inspection was nothing more than a pretext to gain entry by MPD to the Center. Whereas a search "made for the purposes of inventory or administrative regulation" does not require a warrant or probable cause, the same cannot be said for "searches that are *not* made for those purposes." Whren v. U.S., 517 U.S. 806, 811-12 (1996) (emphasis in original). See also WAYNE R. LAFAVE, 1 SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 1.4(f) at 150 n.130 (2004) (defendant may establish a "Fourth Amendment violation by showing the [administrative search made without probable cause] was in fact undertaken for some other purpose (i.e. mainstream law enforcement)"). Moreover, the evidence proffered by plaintiffs might permit a jury to infer that the inspection was conducted with the intent to disrupt the scheduled demonstration, thereby violating plaintiffs' right to public expression.

**2. Mass Arrests**

Ramsey and Gainer argue that they cannot be held liable for violations stemming from the mass arrests because they did not order those arrests and arrived at the scene after the fact. Dist. Memo at 13. In response, plaintiffs proffer evidence indicating that Ramsey and Gainer were in fact on the scene at the time of the mass arrests, and that they "acquiesced and affirmed" the decision to make those arrests. Statement of Material Facts As To Which There Exists A Genuine Issue to Litigate ("Pls. Stmt. of Facts II") at ¶ 61 (citing Deposition of Terence W. Gainer at 154:18-155:1, 164:9-166:3, attached to Plaintiffs' Opposition to Defendants Chief Charles H. Ramsey's and Terrance W. Gainer's Memorandum of Points and Authorities in Support of Their *Renewed* Motion for Summary Judgment ("Pls. Opp. II") at Exh. 7). That evidence, if credited by the jury, would create a genuine issue of material fact as to Ramsey's and Gainer's express and personal approval and involvement in the mass arrests.

Moreover, as I concluded in reference to the closing of the Center, a jury might infer – despite defendants' assertions otherwise, that the unconstitutional mass arrests were motivated by a desire to stop the demonstration and thereby prevent any further expression of the demonstrators' viewpoint. This question of intent is one for the jury and I therefore must conclude that a genuine issue of material fact exists as to what actions were personally taken by Ramsey and Gainer and whether those actions were motivated by an intent to prevent further demonstrations.

**3. Excessive Force**

Brian Edwards-Tiekart and Sasha Wright claim to have been struck in the face with batons wielded by MPD officers who, they allege, had removed their badges and

name tags to conceal their identities. Pls. Stmt. of Facts I at ¶¶ 1-2. Adam Eidinger claims to have been injured by pepper spray fired by MPD officers without justification. Id. at ¶ 37. Robert Fish claims that he was beaten on April 17, 2000, while trying to photograph police misconduct at the Protests. Id. at ¶ 38.

**a. 42 U.S.C. § 1983**

The District seeks dismissal of claims arising from these allegations of excessive use of force and brought under 42 U.S.C. § 1983 on the basis that the plaintiffs cannot establish a municipal policy or practice.

In response, plaintiffs proffer evidence indicating that:

- High-ranking MPD officers were aware of and tolerated the practice of officers removing their badges and nameplates so as to prevent subsequent identification. Pls. Opp. I at 3-5 (citing FBI Washington Field Office Log, attached to Pls. Opp. I at Exh. 39).

- MPD lacked adequate requirements for the reporting of the use of force by its officers. Id. at 7-8 (citing Letter from William R. Yoemans, Department of Justice Acting Assistant Attorney General, Civil Rights Division to Mayor Williams and Chief Ramsey, attached to Pls. Opp. I at Exh. 5).

- It was the procedure of MPD to suspend during demonstrations certain obligations involving the reporting of the use of force by its officers. Id. at 8-11 (citing Force Investigation Team Report, attached to Pls. Opp. I at Exh. 4).

- When force was used at demonstrations, MPD "routinely violated" the requirement that alleged misconduct be investigated. Id. at 12-13 (quoting Deposition of Patrick Burke at 98:1-15, attached to Pls. Opp. I at Exh. 13).

- While the officers in the Civil Disturbance Unit ("CDU") received substantial training in handling demonstrations, the officers who struck Edwards-Tiekart and Wright were from a non-CDU that received minimal relevant training. Id. at 15-16 (citing Report of the Force Investigation Team at 16, attached to Pls. Opp. I. at Exh. 4).

Plaintiffs argue that these examples of alleged patterns and practices combined to cause officers to believe that the use of excessive force would be without personal

consequence, rendering the use of such force more likely. While defendants take issue with the weight and substance of the proffered evidence, Defendant District of Columbia's Reply Memorandum of Points and Authorities in Support of its Motion for Summary Judgment ("Dist. Reply") at 4-8, it cannot be said that no reasonable person who credits it could arrive at the conclusion that the use of excessive force against the plaintiffs was pursuant to a policy or practice.

**b. Robert Fish**

Defendants seek to dismiss Fish's claim of excessive use of force brought under 42 U.S.C. § 1983 based on their belief that the District can not be liable for torts committed by the alleged aggressor. Dist. Memo at 26-27. As I have indicated in a related case, the man that Fish claims beat him without provocation has since been identified as Officer John Louryk, a Transit Police Department officer[3] who was deputized as a deputy United States Marshal at the start of the demonstrations pursuant to an agreement that rendered the United States – and not the District – responsible for any tortuous act he committed. Fish v. United States, No. 06-CV-1281, 2007 WL 4287658, at *2-3 (D.D.C. Dec. 17, 2007).

Fish intends to testify, however, that Louryk was assisted by an MPD officer. Pls. Opp. I at 18. Believing that Louryk was an angry motorist because he was in plainclothes and not wearing a badge, Fish claims he called out to a nearby uniformed MPD officer for help. Id. That officer, who wore no badge, refused to help him, stating: "It's okay. He's [i.e. Louryk] a police officer." Id. (quoting Deposition of Robert Fish at 103:20-104:9, attached to Pls. Opp. I at Exh. 32). According to Fish, the MPD officer then helped Louryk drag Fish, who was bleeding from his head, and threw him against a wall.

[3] Louryk was employed by the Washington Metropolitan Area Transit Authority.

Id. at 107:16-108:9. Plaintiffs also claim that Ramsey was aware of the confrontation and did nothing to intervene, and rely on two cases that hold that an officer may be held liable under 42 U.S.C. § 1983 when he fails to intervene to stop an unprovoked beating, even if he does not participate. Pls. Opp. I at 17 (quoting Fundiller v. Copper City, 777 F.2d 1436, 1441-42 (11th Cir. 1985); Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986)).

The District, in reply, deals only with Fish's 42 U.S.C. § 1983 claim premised on his allegation that Chief Ramsey was nearby and did nothing to prevent the attack. The District argues that Fish's deposition testimony as to Ramsey's presence and awareness is mere speculation and cannot establish that Ramsey was close enough to see the confrontation. Dist. Reply at 10-11. While that speaks to the District's potential 42 U.SC. § 1983 liability based on Ramsey's alleged indifference, it ignores that the District could also be liable under 42 U.S.C. § 1983 based on the MPD officer's involvement in, and indifference to, the beating being administered by Louryk. As explained above, there is a jury question as to whether the District tolerated, condoned, or was indifferent to the excessive use of force by its officers to the point of being a policy or custom. It cannot be said that no reasonable person who credits plaintiffs' evidence could arrive at the conclusion that the MPD officer acquiesced and assisted Louryk pursuant to a policy or custom.

## V. Motions to Strike

I have not relied upon any of the exhibits challenged by the parties in their Motions to Strike, and the motions will therefore be denied as moot. See, e.g., Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121, 123 n.1 (D.D.C. 2001) ("The Court does not

rely on these affidavits in its decision and therefore will deny defendants' motion to strike as moot.”).

## VI. Conclusion

For the reasons stated above, I recommend that plaintiffs’ motion for summary judgment be granted and that defendants’ motions be denied. In addition, I will deny as moot the motions to strike.

I have one final recommendation that admittedly goes beyond the merits of the parties’ motions. This case has been mired in paper and process for many years; it is possible that the passage of time has brought with it a change in the perspectives and goals of the parties – at the very least, it has brought with it a new mayor and administration. It therefore seems appropriate for the parties to engage in mediation to determine whether this litigation – now approaching its seventh anniversary – might be resolved in a manner beneficial to all of the parties.

I therefore recommend that this Report and Recommendation be adopted without prejudice for a period of 45 days, during which time the parties are to enter into settlement discussions; if no settlement has been reached by then, I recommend that the parties be given an opportunity to object to the conclusions of this Report and Recommendation.

**Failure to file timely objections to the findings and recommendations set forth in this report may waive your right to appeal from an order of the District Court adopting such findings and recommendations. See Thomas v. Arn, 474 U.S. 140 (1985).**

Date: February 28, 2008

/s/
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE